UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JUSTIN CAPELL,<br><br>Defendant | Criminal No. 21cr10056<br><br>Violation:<br><br><u>Count One</u>: Conspiracy to Commit Visa Fraud<br>(18 U.S.C. § 371)<br><br><u>Forfeiture Allegation</u>:<br>(18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461) |

INFORMATION

At all times relevant to this Information:

General Allegations

1.      Defendant JUSTIN CAPELL ("CAPELL") was a resident of Massachusetts. From in or about 2002 to in or about November 2019, CAPELL worked for Global Premier Soccer ("GPS"). During this time, CAPELL held several positions at GPS including soccer coach, Clinical Director, and Chief Operating Officer – a position he held from 2010 to 2019.

2.      GPS was a youth soccer organization based in Waltham, Massachusetts with affiliates throughout the United States and abroad. Among other things, GPS offered youth soccer instruction through clinics, town leagues, elite club leagues, tournaments, and international residential academies. Many of GPS's employees (including its coaching staff) were foreign nationals present in the United States on temporary, non-immigrant visas.

3.      Co-Conspirator 1 ("CC-1") was a resident of Massachusetts and served as the Chief Executive Officer of GPS.

1

4. Co-Conspirator 2 ("CC-2") was a citizen and national of the United Kingdom. From at least 2013 to in or about about June 2020, CC-2 worked for GPS as a soccer coach and in the Human Resources department.

5. Co-Conspirator 3 ("CC-3") was an attorney and the owner of a law firm based in Framingham, Massachusetts that specialized in immigration law. GPS retained CC-3 to assist in obtaining visas for GPS's foreign coaching staff.

6. Syracuse Pro Sports, LLC, which did business as the Syracuse Silver Knights, was a professional indoor men's soccer club based in Syracuse, New York. From 2014 through 2018, the Silver Knights competed in the Major Arena Soccer League ("MASL"). In or about June 2018, the Silver Knights moved to Utica, New York and became Utica City FC, which continues to compete in the MASL.

7. Individual-1 was a resident of New York and an owner and the president of the Silver Knights organization.

8. Boston Elite Soccer, LLC, which did business as the Boston Breakers, was a professional women's soccer club based in Allston, Massachusetts. From 2013 through 2017, the team competed in the National Women's Soccer League ("NWSL"). In or about January 2018, prior to the start of the 2018 season, the Boston Breakers ceased operations and the organization dissolved.

9. Individual-2 was a resident of Massachusetts and a part owner and Co-Managing Partner of the Boston Breakers.

10. Individual-3 was a citzen and national of the United Kingdom and served as General Manager and at different times as President of Soccer Operations and Development for the Boston Breakers. Prior to working with the Boston Breakers, Individual-3 worked at GPS.

11. Sky Blue FC was a professional women's soccer club based in Harrison, New Jersey. Since 2013, the team has competed in the NWSL.

12. Beneficiary-1 was a citizen and national of the United Kingdom who worked as a soccer coach for GPS in Massachusetts. From 2013 through 2019, Beneficiary-1 was present and worked in the U.S. pursuant to Professional Support ("P-1S") visas obtained through the Silver Knights and Boston Breakers, several temporary H-2B non-agricultural worker visas obtained by GPS affiliates in Massachusetts, New York, and Maine, and a J-1 temporary exchange visitor visa, all of which were submitted for the ultimate benefit of GPS.

13. Beneficiary-2 was a citizen and national of the United Kingdom who worked as a soccer coach for GPS in Massachusetts. From 2013 to 2017, Beneficiary-2 was present and worked in the U.S. pursuant to several H-2B visas obtained by GPS affiliates in Massachusetts, New Hampshire, Rhode Island, and New York. Beneficiary-2 was also listed in a P-1S petition filed by the Boston Breakers, but was denied.

The P-1S Visa Program

14. Professional athlete ("P-1A") visas are a category of visas available to foreign nationals who perform as athletes individually or as part of a U.S. team at an internationally recognized level. The P-1A classification allows for temporary admission of individual athletes to the United States for up to five years. P-1A visas can be extended in increments of up to five years.

15. P-1S visas are available for essential support personnel for P-1A athletes in the United States. Essential support personnel are eligible for P-1S classification if they are integral to the performance of a P-1A athlete, and perform support services that cannot be readily

performed by a U.S. worker.  Support personnel may include coaches, scouts, trainers, broadcasters, referees, linesmen, umpires, and interpreters.

16. In order to apply for a P-1S visa, an employer has to submit to United States Citizenship and Immigration Services ("USCIS") a Form I-129, Petition for Nonimmigrant Worker.  In addition to the Form I-129, an employer also had to submit several supporting documents including: (i) a consultation letter from a labor organization with expertise in the area of the beneficiary's skill; (ii) a statement describing why the beneficiary is essential and his or her experience with the P-1 athlete; and (iii) a copy of a contract or summary of the terms of the oral agreement between the beneficiary and the employer.

17. Upon approval of the Form I-129, USCIS notifies the petitioning employer of the approval and that foreign workers must apply for the P-1S visas with the U.S. Department of State. As part of the application process, beneficiaries must attend an interview at a United States Embassy or Consulate abroad during which they are asked questions about their employment in the United States.

### The H-2B Visa Program

18. The H-2B non-agricultural worker program is administered by the United States Department of Labor ("DOL") and USCIS, .  The H-2B program allows United States employers to fill specific, temporary non-agricultural jobs.  For an employer to qualify for H-2B classification, the employer is required to establish that:

a. The need for the foreign workers' services or labor is temporary;

b. There are an insufficient number of United States citizens who are able, willing, or qualified and available to do the temporary work; and

        c.        The employment of H-2B foreign workers will not adversely affect the wages and working conditions of similarly employed United States citizen workers.

19.        Before requesting H-2B classification from USCIS, an employer seeking H-2B workers first must submit an Application for Foreign Temporary Labor Certification, known as an ETA-9142, to DOL. The completed ETA-9142 must describe the number of jobs to be filled and the specific nature, dates, and location of the jobs that the H-2B workers will perform in the United States.

20.        An employer must demonstrate in the ETA-9142 that it has conducted recruitment efforts in the geographical area of the proposed employment and has not found United States citizen workers willing to perform the work set forth and described in the ETA-9142 at the prevailing wage for that area.

21.        After DOL issues a Final Determination Letter certifying an employer for use of H-2B workers for specified jobs and job locations, the employer must submit a Form I-129, Petition for Nonimmigrant Worker, to USCIS to obtain approval for the issuance of H-2B visas. The I-129 requires the employer to describe the number of jobs to be filled, the number of H-2B visas requested for temporary alien workers, and the specific nature and location of the jobs that the H-2B workers will perform in the United States.

22.        Upon USCIS approval of the I-129, USCIS notifies the employer that its petition has been approved and that foreign workers may apply for the H-2B visas with the U.S. Department of State at the United States Embassy or Consulate abroad.

23.        Once a foreign worker enters the United States on an H-2B visa, that worker is only permitted to work for the employer who submitted the ETA-9142 and I-129 that resulted in the

issuance of the worker's H-2B visa, and only in the specific geographic location reflected in those forms.

### Overview of the Conspiracy

24. From in or about at least 2016 through in or about October 2019, CAPELL and coconspirators known and unknown to the U.S Attorney conspired to defraud federal agencies by submitting false and fraudulent visa petitions in order to secure work visas for hundreds of GPS employees.

### Object and Purpose of the Conspiracy

25. The principal object of the conspiracy was to commit visa fraud, in violation of Title 18, United States Code, Section 1546(a). The principal purpose of the conspiracy was to use fraudulently obtained temporary work visas and immigration benefits in order to create and maintain a permanent U.S. workforce for GPS at a fraction of what it would otherwise cost.

### Manner and Means of the Conspiracy

26. Among the manner and means by which CAPELL, CC-1, CC-2, CC-3, and others known and unknown to the U.S. Attorney carried out the conspiracy were the following:

   a. Filing P-1S petitions on behalf of at least seven professional soccer teams that contained materially false and misleading information regarding the teams' purported need for P-1S beneficiaries, how the beneficiaries would be employed, how much the beneficiaries would be paid, and what entity would employ them.

   b. Creating false contracts between professional sports teams and the purported beneficiaries and including those contracts as part of the fraudulent P-1S visa submissions.

      c.      Making false representations to the visa beneficiaries concerning, among other things, the nature of their work and pay and, in some instances, directing them to mislead the U.S. State Department and USCIS during visa interviews.

      d.      Employing beneficiaries of P-1S visas as youth soccer coaches instead of as employees of the petitioning professional sports teams, as required by the visas.

      e.      Filing H-2B petitions that contained materially false and misleading information about the need, scope, and location of the jobs the H-2B foreign workers would fill.

      f.      Instructing foreign workers to lie about the terms of their employment with GPS during H-2B visa interviews with U.S. State Department personnel.

      g.      Employing beneficiaries who received H-2B visas in geographic locations other than those authorized by the visas.

Overt Acts in Furtherance of the Conspiracy

27.      From in or about at least 2016 through in or about October 2019, CAPELL, CC-1, CC-2, CC-3, and others known and unknown to the U.S. Attorney, committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

False P-1S Visas

      a.      On or about June 1, 2016, at CC-1's direction, CAPELL created fake employment contracts for various GPS employees. The contracts stated, falsely, that the employees would work as "Scouts" for Sky Blue and as "Assistant Coaches / Scouts" for the Boston Breakers—at salaries far above their actual GPS compensation—and falsely indicated that they would report directly to the teams' Head Coaches and/or Technical Directors.

b.   On or about June 28, 2016, CC-3 submitted a petition to USCIS on behalf of Sky Blue seeking the issuance of seven P-1S visas. The petition contained materially false information about the beneficiaries' purported employment and attached fraudulent supporting documentation, including the false employment contracts CAPELL had created.

c.   At some point prior to July 2016, CAPELL and CC-1 instructed a GPS employee to fabricate coaching licenses for various P-1S beneficiaries that appeared to be issued by the English Football Association (the "FA").

d.   On or about July 6, 2016, CC-3 submitted to USCIS a petition on behalf of Sky Blue seeking the issuance of an additional six P-1S visas. The petition contained materially false information about the beneficiaries' purported employment and attached fraudulent supporting documentation – including at least two fake FA coaching licenses.

e.   On or about November 18, 2016, CC-3 submitted to USCIS a petition on behalf of the Boston Breakers seeking the issuance of seven P-1S visas, including one for CC-2. The petition contained materially false information about the beneficiaries' purported employment and attached fraudulent supporting documentation – including false employment contracts.

f.   On or about January 3, 2017, in response to a Request for Evidence ("RFE") issued by USCIS regarding the employment of the beneficiaries included in the Boston Breakers' petition, CC-3 emailed CC-1 and CAPELL a proposed response to the RFE that falsely purported to be from Individual-2, the Co-

      Managing Partner of the Boston Breakers. The response falsely stated that the beneficiaries were employees of the Boston Breakers.

g. Later that same day, CC-1 responded via email to CC-3 and CAPELL that Individual-2 "[i]sn't going to be able to say employees of the company." CC-1 stated: "If this isn't going to work we might be in trouble here. We could maybe add back in assistant coaches but we can't have him outright say that they are employees."

h. On or about January 6, 2017, CC-3 submitted a response to the RFE that included the original language CC-3 had proposed, falsely stating that the beneficiaries "remain employees of the Company." The response was signed by Individual-3, the President of Soccer Operations and Development, who was also a former GPS employee, and not by Individual-2

i. In or around December 2016, at CC-1's direction, CAPELL created fake employment contracts, bearing the forged electronic signature of Individual-1, and stating, falsely, that the employees—who actually worked for GPS—would be employed as "Assistant Coaches/Scouts" by the Silver Knights, and would report directly to the Head Coach and/or Technical Director.

j. On or about December 27, 2016, CC-3 submitted to USCIS a petition on behalf of the Silver Knights seeking the issuance of seven P-1S visas, including one for Beneficiary-1. The petition contained materially false information about the beneficiaries' purported employment and attached fraudulent supporting documentation, including the false employment contracts CAPELL had created.

k.  On or about January 10, 2017, prior to Beneficiary-1's visa interview at the U.S. Consulate in Belfast, Northern Ireland, CC-1 provided Beneficiary-1 with instructions, by e-mail, telling her how to falsely describe her purported job with the Silver Knights during the interview.

l.  On or about February 23, 2017, in advance of a welcome/training session for new GPS soccer coaches, CC-1 instructed CAPELL, CC-2, and others by email to separate the coaches seeking P-1S visas from the rest of the group so that they could be instructed how to answer questions (falsely) during their visa interviews. CC-1 explained: "They will need to be rock solid at the embassy. Their line will be that they are coming out to coach for the Florida tropics [a professional soccer team based in Lakeland, Florida] – They can be told that once in the US the tropics will assign them to GPS as a scout all consistent with our partnership but they shouldn't bring that up at the interview by any means[.] They shouldn't even mention GPS even though GPS is effectively acting as the coach placement agency[.]"

m.  On or about March 31, 2017, Individual-1 e-mailed CC-3, asking: "Is the US government aware of who are paying these scouts? There are no contracts with the silver knights." CC-3 responded, falsely: "Yes, we include the contract showing that GPS is paying them when we file petitions."

n.  In or around January 2018, at CC-1's direction, CAPELL instructed CC-2 to have GPS coaches on Silver Knights P-1S visas create false, backdated scouting reports to make it appear they were working for the Silver Knights.

o.  On or about February 7, 2018, CC-2 emailed CAPELL and CC-1 regarding the false scouting reports, asking: "Do you have templates from Syracuse so I can send out to staff on the Syracuse P1 for their scouting reports? Also – what is the deadline for them to submit for the months they have been on the visa already?" CAPELL responded, via email: "Yes, the months they have been on the visa."

False H-2B Visas

p.  On or about November 22, 2016, CC-3 submitted to USCIS a petition seeking the issuance of 18 H-2B visas for Program Assistants for GPS in New York. USCIS approved the petition on or about December 1, 2016.

q.  On or about January 19, 2017, CC-2 e-mailed Beneficiary-2 to alert him that he had been placed on a GPS New York H-2B visa. CC-2 instructed Beneficiary-2 to provide GPS's New York office address if Beneficiary-2 was asked during the visa interview for an address in the United States. In fact, Beneficiary-2 worked in Massachusetts. CC-2 also instructed Beneficiary-2 to list CAPELL if asked for a contact in the United States. CC-2's email attached a document with instructions on how to navigate the visa process. That document contained the following warning:

> It is very important that you are completely prepared when you go for your Visa interview. First of all, **you must be aware of what Visa you are being transferred onto.** Sometimes, depending on visa space, you may be assigned to a visa for a different state than the state that you will actually be working in. For example, if you are going onto a GPS-New York Visa but have been assigned to work in Mass, at your interview, you will tell the interviewer you will be going to our Franchise in New York. If you are being put on a New York visa and you tell the consulate you are

11

working in Mass, this will raise red flags and potentially cause your Visa to be denied.  (emphasis in original).

<u>COUNT ONE</u>
Conspiracy to Commit Visa Fraud
(18 U.S.C. § 371)

The U.S. Attorney charges:

28. The U.S. Attorney re-alleges and incorporates by reference paragraphs 1-27 of this Information.

29. From in or about at least 2016 through in or about October 2019, in the District of Massachusetts and elsewhere, the defendant,

JUSTIN CAPELL,

conspired with others known and unknown to the U.S. Attorney to commit visa fraud, that is, to knowingly make under oath and as permitted under penalty of perjury under Title 28, United States Code, Section 1746, to subscribe as true, any false statement with respect to a material fact in any application, affidavit, and other document required by the immigration laws and regulations prescribed thereunder, and to knowingly present such application, affidavit, and other document which contains any such false statement and which fails to contain any reasonable basis in law and fact, in violation of Title 18, United States Code, Section 1546(a).

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

30. Upon conviction of the offense in violation of Title 18, United States Code, Section 371, as set forth in Count One, the defendant,

JUSTIN CAPELL,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

31. If any property described in paragraph 30 above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a.  cannot be located upon the exercise of due diligence;

   b.  has been transferred, or sold to, or deposited with a third party;

   c.  has been placed beyond the jurisdiction of the Court;

   d.  has been substantially diminished in value; or

   e.  has been commingled with other property that cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of the defendant up to the value described in paragraph 30 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

ANDREW E. LELLING
UNITED STATES ATTORNEY

/s/ Jordi de Llano
_____
JORDI DE LLANO
MACKENZIE A. QUEENIN
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS


District of Massachusetts: February 12, 2021